# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| RICK WYGLE, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> vs. <br><br> MILWAUKEE ELECTRIC TOOL CORPORATION, <br><br> Defendant. | Case No. 2:26-cv-00950 <br><br><br><br><br> **CLASS ACTION COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Rick Wygle ("Plaintiff") on his own behalf and on behalf of all others similarly situated, by and through his respective counsel, bring this action against Defendant, Milwaukee Electric Tool Corporation ("Defendant" or "Milwaukee"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE CASE

1. This class action arises from Milwaukee's retention of profits generated by unlawful tariffs imposed by the federal government under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq*.

2. Beginning in February 2025, the federal government imposed sweeping tariffs on imports from numerous countries under purported authority of the IEEPA. Those tariffs dramatically increased the cost of imported consumer goods sold in the United States.

3. U.S. importers—including Milwaukee—responded by increasing prices on consumer goods to offset the cost of these tariffs. As a result, American consumers paid higher retail prices for consumer goods reflecting the economic burden of those tariffs.

4. Milwaukee raised prices on Milwaukee-branded products, including, but not limited to M12/M18 cordless tools and lithium-ion batteries as a result of the IEEPA tariffs.

5. In January 2026, Milwaukee filed suit against the United States and U.S. Customs and Border Protection ("CBP") seeking refunds of IEEPA tariffs paid on Milwaukee imports.[1]

6. On February 20, 2026, the Supreme Court held that the IEEPA-based tariffs were unlawful. *Learning Resources, Inc. v. Trump*, 607 U.S. ___, 146 S.Ct. 628 (2026).

7. As a consequence of that decision, importers who paid those tariffs—including Milwaukee—became entitled to refunds of the duties they previously paid to CBP.

8. Milwaukee collected the tariffs from consumers through increased prices on its products, while seeking refunds of the same tariff payments from the federal government.

9. Unless restrained by this Court, Milwaukee stands to recover the same tariff payments twice—once from consumers and again from the federal government through tariff refunds, including interest paid by the government on those funds.

10. Milwaukee has made no legally binding commitment to return tariff-related surcharges to the consumers who actually paid them.

11. Plaintiff brings this action on behalf of millions of consumers who purchased goods from Milwaukee during the Class Period and who paid tariff surcharges reflecting Milwaukee's pass-through of unlawful tariffs.

12. Plaintiff seeks restitution of those tariff overcharges, together with appropriate declaratory, injunctive, and monetary relief.

---

[1] *See* Complaint, *Milwaukee Electric Tool Corp. v. United States, et al.*, No. 1:26-cv-142 (Ct. Int'l Trade (Jan. 7, 2026), ECF No. 2.

2

## JURISDICTION AND VENUE

13. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because: (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

14. The Court has personal jurisdiction over Defendant because Milwaukee is headquartered in Brookfield, Wisconsin, in this State, conducts significant business transactions in this State, and because Defendant's wrongful conduct occurred in and emanated from this State.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business in located in in this District in Brookfield, Wisconsin, and a substantial portion of the events and conduct giving rise to the claims occurred in this District.

## PARTIES

18. Plaintiff Rick Wygle is a resident and citizen of Renton, Washington. During the Class Period, Plaintiff Wygle purchased goods from Milwaukee that were subject to increased prices from the IEEPA tariffs, including a Milwaukee 18V Lithium-Ion Compact Impact Driver. Plaintiff Wygle paid retail prices for those goods that were increased by Milwaukee's tariff surcharge to account for the tariffs imposed on imported products. Plaintiff Wygle would not have paid those higher prices, absent the unlawful tariffs and Milwaukee's pass-through of those tariffs to consumers.

19. Defendant Milwaukee Electric Tool Corporation is a Wisconsin corporation with its principal place of business located at 13135 West Lisbon Road, Brookfield, Wisconsin 53005. Milwaukee is one of the largest manufacturers and distributors of professional-grade power tools, cordless tool systems, batteries, and related equipment in the United States. Milwaukee is

responsible for the marketing, importation, distribution, and sale of Milwaukee-branded products throughout the United States. During the Class Period, Milwaukee imported substantial quantities of products and components from countries subject to tariffs imposed under IEEPA, including products manufactured in China and other foreign jurisdictions subject to the IEEPA tariff regime.

## FACTUAL BACKGROUND

### A.  Milwaukee's Business

20.  Milwaukee is one of the largest manufacturers and distributors of professional-grade power tools, cordless tool systems, batteries, chargers, hand tools, and related equipment in the United States.

21.  Milwaukee markets and sells a broad portfolio of products under the "Milwaukee" brand, including its flagship M12 and M18 cordless tool systems, lithium-ion batteries, outdoor power equipment, PACKOUT storage systems, and numerous accessories designed for professional contractors, tradespeople, and industrial users.

22.  Milwaukee products are sold nationwide through major retailers and distributors, including Home Depot, Acme Tools, Northern Tool, Grainger, Fastenal, and numerous independent tool distributors and supply houses.

23.  Milwaukee's business model depends heavily on the manufacture, importation, and distribution of products and product components sourced through global supply chains.

24.  Milwaukee maintains substantial overseas manufacturing operations, including significant manufacturing and assembly operations in China and other countries subject to tariffs imposed under the IEEPA.

25.  Milwaukee's cordless tool systems are particularly dependent on imported lithium-ion battery cells, battery assemblies, electronic components, motors, castings, and other materials

4

commonly sourced from overseas manufacturers.

26. Because Milwaukee relies on imported products and components, tariffs imposed on goods imported from China and other foreign jurisdictions directly affected Milwaukee's cost structure during the Class Period.

27. Milwaukee publicly acknowledged this fact when it issued notices to distribution partners informing them of the tariffs and the resulting material increased pricing of its products.

28. Milwaukee's business operations, import practices, and tariff-related pricing policies are central to the claims asserted in this action because Milwaukee seeks to retain the benefit of tariff-related price increases imposed on consumers while simultaneously pursuing tariff-refund rights corresponding to those same unlawful tariffs.

29. The exact amount of tariff charges implemented by Milwaukee is currently unknown but will be uncovered during discovery.

30. On information and belief, Milwaukee began imposing tariff-related price increases on its products no later than May 1, 2025, and did so in direct response to the federal government's imposition of IEEPA tariffs.

31. Milwaukee has directly admitted that tariffs affected its cost structure and that it chose to shift part of that tariff burden to consumers. Rather than absorbing the tariff costs itself, Milwaukee raised prices to consumers tied directly to those tariffs.

**B. The IEEPA Tariffs**

32. Beginning in February 2025, President Trump invoked the IEEPA to impose tariffs on imports from numerous foreign countries pursuant to a series of executive orders declaring national emergencies related to trade and supply chain concerns.[2]

---

[2] *See* Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 7, 2025); Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs*

5

33. Those executive orders imposed sweeping tariffs on imports from key U.S. trading partners. The orders included duties of approximately 25 percent on many imports from Canada and Mexico and additional tariffs on imports from China that were layered on top of existing duties, resulting in substantially higher effective tariff rates on Chinese goods.[3]

34. The tariffs significantly increased the cost of imported consumer goods entering the United States, particularly for retailers and other businesses that rely heavily on international supply chains to source merchandise—like Milwaukee.[4]

35. Under U.S. customs law, the importer of record is responsible for paying tariffs when goods enter the United States. Accordingly, importers of record—including Milwaukee— were required to pay the IEEPA tariffs to U.S. CBP upon entry of covered merchandise into the country.[5]

36. Numerous importers challenged the legality of the IEEPA tariffs in the United States Court of International Trade, arguing that the President lacked statutory authority under IEEPA to impose tariffs of that nature.[6]

37. On February 20, 2026, the Supreme Court of the United States held that the

*Across Our Northern Border*, 90 Fed. Reg. 9113 (Feb. 7, 2025); Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 7, 2025).

[3] *See* Andrea Shalal, Jarret Renshaw & David Lawler, *Trump launches trade war with tariffs on Mexico, Canada and China*, Reuters (Feb. 1, 2025), https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/ (last accessed May 27, 2026).

[4] *See* Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018 Tariffs on Prices and Welfare*, 33(4) J. Econ. Persp. 187 (2020), https://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.33.4.187 (last accessed May 27, 2026).

[5] *See* CBP, *Importing Into the United States: A Guide for Commercial Importers* (2006), https://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf (last accessed May 27, 2026).

[6] *See* Reuters, *Trump administration sued over tariffs in US Court of International Trade*, The Business Standard (Apr. 15, 2025), https://www.tbsnews.net/worldbiz/usa/trump-administration-sued-over-tariffs-us-court-international-trade-1116021 (last accessed May 27, 2026).

challenged tariff regime was unlawful and that IEEPA does not authorize the President to impose tariffs of the type challenged in that litigation and invalidated the tariff orders issued pursuant to that statute. *Learning Res., Inc. v. Trump*, 607 U.S. ___, 146 S.Ct. 628 (2026).

38.     The Supreme Court's decision effectively eliminated the legal basis for the IEEPA tariffs and created a pathway for importers that had paid those duties—including Milwaukee—to seek refunds of the tariffs previously collected by the federal government.

39.     The tariffs invalidated by the Supreme Court were part of a sweeping trade policy announced on April 2, 2025—referred to by the Trump administration as "Liberation Day." On that date, the President declared a national emergency and invoked the IEEPA to impose broad tariffs on imported goods entering the United States.

40.     As part of the "Liberation Day" program, the federal government imposed a baseline tariff of approximately 10% on nearly all imports, with additional "reciprocal" tariffs targeting specific countries at higher rates, including major U.S. trading partners.

41.     These tariffs were implemented within days of the announcement, with the baseline tariffs taking effect on or about April 5, 2025, and higher country-specific tariffs scheduled to take effect shortly thereafter.

42.     From April 2, 2025 onward, this tariff regime under IEEPA imposed a 34% tariff on imported power tools and a separate 54% IEEPA tariff on lithium-ion batteries for cordless tools, raising typical cordless drill-kit prices.[7] This is especially important here given Milwaukee's products are imported power tools, and many of its offering rely on lithium-ion batteries and related parts.

43.     In response to the "Liberation Day" tariffs, and in anticipation of the same,

---

[7] *See* TariffTax.org, *What's the Tariff on Power Tools?: Power tools from China and Mexico*, https://www.tarifftax.org/tariff-on/power-tools (last accessed May 27, 2026).

companies that relied on imported goods—including companies like Milwaukee—began adjusting pricing, sourcing, and supply chain strategies to account for increased import costs.

**C.     Tariffs Are Economically Borne By Consumers**

44.     Economists and government agencies widely recognize that tariffs are largely borne by domestic consumers rather than foreign exporters or the importers that formally remit the duties.

45.     Economic studies examining recent U.S. tariff regimes consistently find that the cost of tariffs is passed through into higher prices paid by U.S. purchasers of imported goods.[8]

46.     When tariffs increase the cost of imported goods, retailers and other downstream sellers typically raise prices to offset those additional costs. Surveys of U.S. businesses conducted by the Federal Reserve Bank of New York during the recent tariff period found that a large majority of companies facing tariff-related cost increases passed at least some portion of those costs through to their customers in the form of higher prices.[9] Companies consider tariffs to be costs that are to be incorporated into the pricing structure.

47.     Similarly, the Federal Reserve Bank of Dallas recently confirmed that the 2025–2026 tariffs materially increased consumer prices and that "pass-through from the 2025 tariffs is effectively complete," meaning the costs of the tariffs were ultimately borne by purchasers through higher prices.[10]

---

[8] *See* Julian Hinz, *et al.*, *America's Own Goal: Who Pays the Tariffs?*, Kiel Inst. for the World Econ. (Jan. 2026), https://www.kielinstitut.de/fileadmin/Dateiverwaltung/IfW-Publications/fis-import/92fb3f30-07b8-4dcf-b2bc-fbefb831f1a1-KPB201_EN.pdf (last accessed May 27, 2026); *see also* Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018 Tariffs on Prices and Welfare*, 33(4) J. Econ. Persp. 187 (2020), https://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.33.4.187 (last accessed May 27, 2026).

[9] *See* Jaison R. Abel, Richard Deitz & Jason Bram, *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Fed. Rsrv. Bank of N.Y. Liberty Street Econ. (June 4, 2025), https://libertystreet economics.newyorkfed.org/2025/06/are-businesses-absorbing-the-tariffs-or-passing-them-on-to-their-customers/ (last accessed May 27, 2026).

[10] *See* Ron Mau & Tucker Smith, *Effects of realized tariff changes on PCE prices peaked in first quarter 2026*, Fed. Rsrv. Bank of Dall. (May 5, 2026), https://www.dallasfed.org/research/economics/2026/0505-mau (last accessed May 27, 2026).

48. The Dallas Federal Reserve further explained that tariff collections "boosted core goods PCE[11] inflation by approximately 2.2 percentage points" and increased overall core PCE inflation by approximately 0.8 percentage points, reflecting widespread downstream price increases imposed on consumers as businesses passed tariff costs through the supply chain.[12]

49. These findings confirm that tariffs imposed during the relevant period functioned as a direct economic burden on consumers because businesses responded to the tariffs by increasing prices charged to end purchasers rather than internally absorbing the additional costs.

50. Milwaukee is no different.

51. During the Class Period, Milwaukee increased prices on a number of its products in direct response to tariff changes.

52. On February 24, 2025, Milwaukee sent a formal written notice to its distributors and channel partners announcing tariff-driven price increases on Milwaukee products. The document was issued by Milwaukee's Group President of Sales, and constituted an official company-wide pricing announcement.[13]

53. In that letter, Milwaukee expressly tied planned price increases to tariffs imposed on imported products. Milwaukee stated that "recent tariff changes – including those implemented on February 4th on imports from China, as well as upcoming proposed tariffs on imports from Mexico and Canada – present new challenges."[14]

---

[11] "PCE" refers to Personal Consumption Expenditures, an economic measure of how much consumers are spending on goods and services in the economy.

[12] *See* Ron Mau & Tucker Smith, *Effects of realized tariff changes on PCE prices peaked in first quarter 2026*, Fed. Rsrv. Bank of Dall. (May 5, 2026), https://www.dallasfed.org/research/economics/2026/0505-mau (last accessed May 27, 2026).

[13] *See* Letter from Darrell Hendrix, Group President, Sales, Milwaukee Tool, to Milwaukee Distribution Partners (Feb. 24, 2025), https://d3fnwqmod42ein.cloudfront.net/userfiles/documents/pdfs/tariff-updates/milwaukee-price-increase-phase1-tariff.pdf (last accessed May 27, 2026).

[14] *Id.*

54. Milwaukee further explained that "to navigate these complexities while maintaining competitive pricing," the company was conducting a "detailed SKU-by-SKU analysis" in anticipation of tariff-related pricing changes.[15]

55. Milwaukee then announced a company-wide pricing policy directly tied to those tariffs, stating: "Effective May 1, 2025 – We will adjust invoice & IMAP prices in response to tariff changes."[16]

56. "IMAP" refers to Internet Minimum Advertised Prices used by manufacturers and distributors to establish minimum advertised retail pricing for products sold through online and retail channels. Milwaukee's statement therefore confirms that tariff-related increases were not limited to internal accounting or distributor costs, but instead directly affected downstream retail pricing visible to consumers.

57. Milwaukee also informed distributors that it would issue updated Distributor Price Lists ("DPLs"), updated IMAPs, and overviews of "affected categories" by April 1, 2025.[17]

58. The letter further stated that the announced price increases were only the beginning of Milwaukee's tariff-related pricing changes. Milwaukee warned distributors that "additional price changes may occur in phases throughout the year" due to the "evolving tariff landscape."[18]

59. Milwaukee supplemented its February 24, 2025 tariff notice letter with a document entitled *Tariff Distribution FAQs*, which Milwaukee distributed to distributors and channel partners in connection with its tariff-related pricing policy.[19]

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *See* Milwaukee Tool, *Tariff Distribution FAQs*, https://d3fnwqmod42ein.cloudfront.net/userfiles/documents/pdfs/tariff-updates/2025-tariff-price-increase-distribution-faq.pdf (last accessed May 27, 2026).

60. In these FAQs, Milwaukee expressly gave the tariff increase was the response to the question "Why are prices increasing?" and explained that it was conducting "a SKU-by-SKU analysis" to determine which products would be affected by tariff-related price increases.[20]

61. Milwaukee further advised distributors that updated pricing lists and IMAPs would reflect tariff-related increases implemented by Milwaukee.[21]

62. The FAQ also warned distributors that "additional adjustments may be necessary if further tariffs are introduced or modified" throughout the year depending on the fluid tariff landscape, confirming that Milwaukee anticipated ongoing tariff-driven price increases.[22]

63. Public distributor notices issued in response to Milwaukee's FAQs confirmed that Milwaukee's tariff-related pricing increases became effective beginning May 1, 2025 and affected broad categories of Milwaukee cordless tools, batteries, and related products.

64. Public consumer and distributor discussions and related online communities further confirmed that Milwaukee implemented broad tariff-related price increases beginning May 1, 2025.

65. For example, in the in the r/MilwaukeeTool Reddit forum, users reported receiving updated Milwaukee price sheets and in-store notices stating that approximately 2,800 of roughly 10,000 Milwaukee SKUs at certain dealers were increasing in price due to tariffs.[23]

66. Consumers in those discussions specifically identified substantial price increases on Milwaukee products including M12 stubby impact wrenches and 12.0 FORGE batteries, with

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *See* u/theshiyal, comment on *Tarrifs raising prices of tools and batteries*, Reddit, r/MilwaukeeTool (Apr. 23, 2025, at 11:10:24 CDT), https://www.reddit.com/r/MilwaukeeTool/comments/1k6009z/tarrifs_raising _prices_of_tools_and_batteries/ (last accessed May 27, 2026).

tariffs expressly cited as the justification for the increases.[24]

67. These public reports are consistent with Milwaukee's formal tariff notice Letter and FAQs acknowledging tariff-driven pricing increases across Milwaukee's product lines.

68. Milwaukee's letter and FAQs constitute direct admissions that Milwaukee increased prices because of tariffs imposed under IEEPA and related executive actions. These documents further demonstrates that Milwaukee implemented a coordinated and systematic tariff pricing policy affecting broad categories of Milwaukee products sold throughout the United States.

69. Milwaukee's statements constitute an express admission that: (a) tariffs increased its cost of goods, and (b) those increased costs were being passed through to consumers.

70. Milwaukee's tariff pricing policy was specifically designed to pass tariff-related costs downstream through increased invoice pricing and increased retail pricing reflected in IMAP schedules.

71. As a result of this policy, consumers purchasing Milwaukee products during the Class Period paid prices that incorporated tariff-related increases implemented by Milwaukee in response to the challenged tariffs.

72. Milwaukee did not disclose to consumers that the tariff-related price increases imposed pursuant to the February 24, 2025 policy might later result in Milwaukee receiving both: (a) the benefit of tariff-inflated pricing paid by consumers; and (b) refunds corresponding to those same unlawful tariffs from the federal government.

73. Consumers purchasing goods from Milwaukee during the Class Period were required to pay an additional amount expressly tied to tariffs, tacked onto the base price of the merchandise. This price increase functioned as a direct pass-through of tariff costs from

---

[24] *Id.*

Milwaukee to its customers. As a result of Defendant's conduct, Plaintiff and Class members paid inflated prices for Milwaukee products due to the illegal IEEPA tariffs.

74.     Plaintiff and Class members paid tariff-inflated prices at Milwaukee during the Class Period, while Milwaukee now seeks to retain both the consumer pass-through and any government refund of the same unlawful tariff charges.

**D.     Tariffs Invalidated By SCOTUS**

75.     As described above, in February 2026, the Supreme Court held that the President's tariff regime exceeded the statutory authority granted by IEEPA and invalidated the challenged tariff orders.[25] Following the SCOTUS decision, importers that had paid IEEPA tariffs—including Milwaukee—became eligible to pursue refunds of those duties.

76.     Prior to the SCOTUS decision, many companies, including Milwaukee, sued the federal government in the United States Court of International Trade seeking to preserve and obtain refunds of tariffs paid under the IEEPA tariff regime. Specifically, Milwaukee filed suit against the United States and CBP seeking refunds of IEEPA tariffs paid on Milwaukee imports.[26]

77.     On March 4, 2026, the Court of International Trade, ordered CBP to stop liquidating IEEPA duties and to reliquidate previously liquidated IEEPA duties where possible, and indicated that the relief extended to "all importers of record" that paid IEEPA duties, including importers that had not filed their own refund suits.[27]

78.     The scale of the refund process is unprecedented. Public reporting estimates that approximately $166 billion in tariffs collected under the IEEPA regime must be refunded to more

---

[25] *See Learning Res., Inc. v. Trump*, 607 U.S. ___, 146 S.Ct. 628 (2026).

[26] *See* Complaint, *Milwaukee Electric Tool Corp. v. United States, et al.*, No. 1:26-cv-142 (Ct. Int'l Trade (Jan. 7, 2026), ECF No. 2.

[27] *See Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 WL 679285 (Ct. Int'l Trade Mar. 5, 2026).

than 330,000 importers across roughly 53 million import entries.[28]

79.    By late April 2026, millions of entries had already entered the refund pipeline, and the federal government began preparing to issue payments to importers as early as May 2026.[29]

80.    These post-decision developments confirm that tariff refunds are not speculative or hypothetical. Rather, they are imminent, substantial, and already in the process of being distributed to importers, including companies like Milwaukee.

81.    Accordingly, Milwaukee's retention of tariff-related surcharges—while simultaneously seeking refunds of those same tariffs—creates a concrete and immediate risk of double recovery that this Court can and should address.

82.    Milwaukee stands to recover substantial sums if tariff refunds are paid.

83.    Milwaukee can expect to recover significant tariff refunds corresponding to duties it paid during the Class Period. Those expected refunds are especially significant here because Milwaukee previously passed tariff-related cost increases through to consumers in the form of higher retail prices, meaning Milwaukee now seeks to recover from the government duties whose economic burden was borne, in whole or in part, by the Plaintiff and Class members.

84.    In practical terms, Milwaukee stands to receive a windfall: it has already recouped tariff costs from consumers through tariff surcharges, and it now stands in line to recover those same unlawful tariff payments from the federal government.

---

[28] *See* Reuters, *U.S. says first refunds from Trump tariffs expected around May 11* (Apr. 29, 2026), https://www.reuters.com/legal/government/us-says-first-refunds-trump-tariffs-expected-around-may-11-2026-04-29/ (last accessed May 27, 2026).

[29] *Id*.

**PLAINTIFF'S EXPERIENCES**

85.     Plaintiff Rick Wygle is a Milwaukee customer and has made a series of purchases from Home Depot of Milwaukee products.

86.     Plaintiff Wygle made several purchases during the Class period where he was charged increased prices due to tariffs.

87.     For example, on or about November 17, 2025, Plaintiff Wygle made a purchase of Milwaukee products, namely an M18 Compact Impact Driver from Home Depot. Upon checkout, Plaintiff Wygle was charged an increased price, which based upon the evidence established above was imposed due to the illegal IEEPA tariff regime.

88.     Plaintiff Wygle is entitled to a refund of all the tariff surcharges, plus interest, he paid to Milwaukee.

**CLASS ALLEGATIONS**

89.     A class action under Civil Rule 23 is the proper form in which to bring Plaintiff's claims. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

90.     This action satisfies all of the implicit and explicit requirements of the Civil Rules, including numerosity, commonality, typicality, adequacy, predominance and superiority.

91.     **Numerosity**: the Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  Given the consumer base of Milwaukee, the class numbers in the hundreds of thousands or millions of consumers.

92. **Commonality:** the claims made by Plaintiff meets the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

  a. whether Milwaukee paid tariffs imposed under the International Emergency Economic Powers Act ("IEEPA") on imported goods during the Class Period;

  b. whether Milwaukee increased retail prices on goods sold to consumers in response to those tariffs;

  c. whether Milwaukee passed through some or all of the tariff costs to consumers through higher prices;

  d. whether Milwaukee sought or will seek refunds of those tariffs from the federal government;

  e. whether Milwaukee' retention of tariff refunds corresponding to tariff costs paid by consumers constitutes unjust enrichment;

  f. whether Milwaukee' conduct was unfair under applicable consumer protection laws; and

  g. the appropriate measure of restitution, damages, or other relief resulting from Milwaukee' conduct.

93. **Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, bought products from Milwaukee subject to tariff related price increases.

94. The claims of the Class Representative Plaintiff are furthermore typical of other Class members because he makes the same claims as other Class members. Plaintiff has an interest

in seeking compensation from Defendant.

95.     **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members.

96.     **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

97.     The nature of this action and the nature of laws available to Plaintiff and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will establish the right of each

17

member of the Class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

98.     The proposed Nationwide Class is described as follows:

**All persons in the United States who purchased goods from Milwaukee during the Class Period on which Milwaukee increased prices due to IEEPA tariffs.**

99.     The proposed Washington Subclass is described as follows:

**All persons in Washington who purchased goods from Milwaukee during the Class Period on which Milwaukee increased prices due to IEEPA tariffs.**

100.    The "Class Period" is the period during which Defendant assessed tariff related charges to consumers. The precise contours of the Class Period can only be determined through discovery. In no event shall the Class Period be less than the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

101.    Plaintiff reserves the right to modify or amend the definition of the proposed class, Class Period, and proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

102.    Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

103.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

104. Excluded from the Class are:

   a. Defendant and any entities in which Defendant has a controlling interest;

   b. Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;

   c. The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

   d. All persons or entities that properly execute and timely file a request for exclusion from the Class; and

   e. Any attorneys representing the Plaintiff or the Class.

## CLAIMS FOR RELIEF

### COUNT I
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

105. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

106. Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them through tariff surcharges imposed on goods during the Class Period.

107. Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

108. Under principles of equity and good conscience, Defendant should not be permitted to retain the amount of the tariff surcharges obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its price increases on goods subject to unlawful tariffs. As it stands, Defendant has retained profits generated from its sales of products

19

subject to tariff-related price increases and should not be permitted to retain those ill-gotten profits when it is seeking a refund of the duties it paid.

109. Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## COUNT II
## Money Had and Received
### (On behalf of Plaintiff and the Class)

110. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

111. Plaintiff alleges this claim individually and on behalf of the proposed class.

112. Defendant received money from Plaintiff and from each member of the proposed Class in the form of a tariff surcharge. The Supreme Court has determined that the tariffs were unlawful.

113. The money belonged to Plaintiff and to each member of the proposed Class.

114. Defendant has not returned the money.

115. It will give offense to equity and good conscience if Defendant is permitted to retain the tariff surcharge. Plaintiff seeks the return of the money in an amount to be proven at trial.

116. Plaintiff seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to her.

## COUNT III
## Violations of Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq.*
### (On behalf of Plaintiff and the Washington Subclass)

117. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

118. Washington's Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq.* ("CPA"), protects consumers by promoting fair competition in markets for goods and services.

119. To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Wash. Rev. Code § 19.86.020.

120. Defendant engaged in unfair and deceptive acts by: (i) raising prices due to tariffs; (ii) representing that prices remained competitive; (iii) failing to disclose that it intended to seek tariff refunds; and (iv) retaining tariff refunds despite having passed the costs to its customers.

121. Defendant's wrongful conduct occurred in the conduct of trade or commerce—i.e., while Defendant was engaged in the operation of its stores nationwide.

122. Defendant has profited immensely from its unlawful conduct.

123. As a result of Defendant's conduct, Plaintiff and the Washington Subclass members were injured in their business or property—i.e., economic injury—in that they paid inflated prices for goods subject to tariffs.

124. Defendant's unfair or deceptive conduct proximately caused Plaintiff's and the Washington Subclass members' injury because, but for the challenged conduct, Plaintiff and the Washington Subclass members would not have paid inflated prices for goods subject to tariffs and they did so as a direct, foreseeable, and planned consequence of that conduct.

125. Plaintiff, individually and on behalf of the Washington Subclass, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IV**
**Declaratory Relief, 28 U.S.C. § 2201**
**(On behalf of Plaintiff and the Class)**

126. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

127. Plaintiff alleges this claim individually and on behalf of the proposed Class.

128. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

21

129. Plaintiff's claims present an actual controversy as to the rightful ownership of the tariff surcharges paid to Defendant.

130. Plaintiff has suffered an injury by having been required to pay Defendant a tariff surcharge because of the subject tariffs on Defendant's product. And Plaintiff will imminently suffer an injury by Defendant's unlawful retention of the tariff refund.

131. This Court can exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiff but refunded to Defendant is unlawful for any of the above reasons.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment against Defendant, as follows:

a. For an order certifying the proposed classes, appointing Plaintiff and his counsel to represent the proposed class and notice to the proposed classes to be paid by Defendant;

b. For damages suffered by Plaintiff and members of the proposed class;

c. For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Defendant;

d. For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e. An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

22

f.      For Plaintiff's reasonable attorneys' fees, as permitted by law;

g.      For Plaintiff's costs incurred;

h.      For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.      For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

Dated: May 27, 2026

Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates
Jonathan T. Deters*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
*tcoates@msdlegal.com*
*jdeters@msdlegal.com*

M. Anderson Berry*
Gregory Haroutunian*
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: 916.823.6955
*anderson@emeryreddy.com*
*gregory@emeryreddy.com*

*Counsel for Plaintiff and the Putative Class*

*\* Applications for admission forthcoming*

23